UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MR. Welton Goodwin JR.
1189 Kingville Rd
Gadsden S.C. 29052

(In the space above enter the full name(s) of the plaintiff(s).)

-against-

LGF Enterprises
C/o Sotel Management

(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. Typically, the company or organization named in your charge to the Equal Employment Opportunity Commission should be named as a defendant. Addresses should not be included here.)

**10 CIV. 5546**

COMPLAINT
FOR EMPLOYMENT
DISCRIMINATION

Jury Trial: ☑ Yes ☐ No
*(check one)*

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

✓ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).
   **NOTE:** *In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

✓ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 - 634.
   **NOTE:** *In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.*

✓ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 - 12117.
   **NOTE:** *In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

✓ New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic chacteristics, marital status).

✓ New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131 (actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status).

RECEIVED
JUN 21 2010
PRO SE

*Rev. 05/2007*                                                1

I.  **Parties in this complaint:**

A.  List your name, address and telephone number. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff  Name MR. WELTON GOODWIN SR.
Street Address 1189 KINGVILLE Rd
County, City (Richland) GADSDEN
State & Zip Code S.C. 29052
Telephone Number (803) 353-8993 Cell 917-751-5919

B.  List all defendants' names and the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Defendant  Name _____
Street Address _____
County, City _____
State & Zip Code _____
Telephone Number _____

C.  The address at which I sought employment or was employed by the defendant(s) is:

Employer LGF ENTERPRISES
Street Address 640 Fifth Avenue Third Fl.
County, City NY, NY
State & Zip Code NY 10019
Telephone Number 212-265-2280

II.  **Statement of Claim:**

State as briefly as possible the facts of your case, including relevant dates and events. Describe how you were discriminated against. If you are pursuing claims under other federal or state statutes, you should include facts to support those claims. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A. The discriminatory conduct of which I complain in this action includes: *(check only those that apply)*

_____ Failure to hire me.

✓ Termination of my employment.

_____ Failure to promote me.

✓ Failure to accommodate my disability.

✓ Unequal terms and conditions of my employment.

Rev. 05/2007                                    2

        \_\_\_\_\_    Retaliation.

        \_\_\_\_\_    Other acts *(specify)*: _____.

    Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.

B.    It is my best recollection that the alleged discriminatory acts occurred on: **MAY 7, 2004**.
                                                                                                                 *Date(s)*

C.    I believe that defendant(s) *(check one)*:

        [✓]    is still committing these acts against me.

        [ ]    is not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

        ☐  race _____    ☐  color _____

        ☐  gender/sex _____    ☐  religion _____

        ☐  national origin _____

        ☐  age. My date of birth is _____ *(Give your date of birth only if you are asserting a claim of age discrimination.)*

        [✓]  disability or perceived disability, _____ *(specify)*

E.    The facts of my case are as follow *(attach additional sheets as necessary)*:

I'am filing this lawsuit. Because It was a Conflick of Interest for the Union and Arbitration Attorney to Represent me Because I'll made a Complaint against the Union and Management. The Union help to take my Grievance. So I'll would like to have a Opportunity to tell my side of the Story and what's Realy going on In Front of a Judge and Jury. And to Explain what happen to me the Day that they say I'll Abandon my Post and other Things that happen Regaud my Job. It's know getting to the point that I'am Afraid For my. Because of the things they have done.

    Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights or the New York City Commission on Human Rights.

III.    **Exhaustion of Federal Administrative Remedies:**

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct on: **MARCH 1, 2007** _____ *(Date)*.

B.  The Equal Employment Opportunity Commission *(check one)*:

   ✓ _____ has not issued a Notice of Right to Sue letter.

   _____ issued a Notice of Right to Sue letter, which I received on _____ *(Date)*.

   *Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.*

C.  Only litigants alleging age discrimination must answer this Question.

   Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*:

   _____ 60 days or more have elapsed.

   _____ less than 60 days have elapsed.

## IV. Relief:

WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: _____

_____

*(Describe relief sought, including amount of damages, if any, and the basis for such relief.)*


**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 4 day of JUNE, 2010.

Signature of Plaintiff  *Wilton Doogh Jr* (signature)

Address  1189 Kingville Rd
         Gadsden S.C. 29052

Telephone Number  (803) 353-8993 cell 917-751-5919

Fax Number *(if you have one)* _____

*Rev. 05/2007*  4

 

Mount Sinai- Irving J. Selikoff
Center for Occupational and
Environmental Medicine

345 East 102nd Street, Suite 215
New York, NY 10029

Tel: (212) 241-5555
Fax: (212) 241-5658

June 07, 2010

RE:   **Welton Goodwin**
      **Follow up Evaluation**
      **WCB# 00503991**
      **DOA: 2004**
      **Date of Evaluation:** June 07, 2010

Patient is here for follow up. He was last seen on March 3rd, 2010. He reports that his neck pain is getting worse, he could not come to see us due to financial difficulty. He presently lives in South Carolina. He saw an orthopedist in South Carolina, but the Doctor wanted to operate on his neck, but he did not agree to due to extent of risks that this surgery may have. He received some therapy, but he feels that therapy makes his neck sore. Cold weather and rain also increases his pain.
Patient is complaining of increasing neck pain, pain radiates to his hands and also complains of left leg and foot pain Patient had a hearing with WCB on June 12, 2007 and Judge has agreed with his case. IME physician Dr. Drew A. Stein saw him and he also opined that his injuries are work related. Patient was referred to pain management and was placed on muscle relaxant. He would like to stay in South Carolina, where his family lives and it is easier for him. Patient reports frequent nocturnal urinary frequency, recently. I have recommended that he should see his primary. I have encouraged him to see a primary in South Carolina, he went and according to him all his tests came up within normal limits. Patient also sees our social worker at the clinic for counseling and she is helping him.
**Medication:** Percocet 7.5/350 mg q 6 hours PO. And Avensa
**Physical Examination:** Neurological evaluation, muscle stretch reflexes are active and symmetrical in all four extremities. Sensory is questionable because the sensory changes did not follow any dermatome pattern and reports of sensory loss on entire side. Motor power was 5/5. He is able do heel and toe walking as well as tandem walking without any problem. Distal motor power, pinches 26 pounds on the right, 24 pounds on the left, grip is 85 pounds on the right and 70 pounds on the left.
**Musculoskeletal:** Back mobility is within normal limits. He is able to bend forward with complete reversal of lumbar lordosis. Neck mobility is restricted, especially on the left with pain at the end of ridge. Shoulder range of motion is within normal limits as well as elbows and wrists. The straight leg raising was 90 degrees in supine and sitting position bilaterally without any pain. Spurling test was positive.

**Assessment and plan:**
Cervical spine radiculopathy

1

Welton Goodwin
Follow up Evaluation
WCB# 00503991
DOA: 2004
Date of Evaluation: June 07, 2010

Patient was referred to Mt.Sinai pain management, but he would like to go to pain management in South Carolina where he lives with his family. He promised me to do so. We will try to find a pain management where he can get help.
Sincerely yours,

Nahid K. Nainzadeh, M.D.
Clinical Associate Professor
Department of Preventivel Medicine
Mount Sinai School of Medicine

The Supreme Court                                                  March 27, 2006
State of New York                                               June 4, 2010

Dear Sir or Madam,

                I Welton Goodwin am writing you in reference to my case number 101074818, filed to the State Division of Human Rights.  I'm asking for the Supreme Court, State of New York to review my case for appeal.
                I would like to tell you a little bit about what's going on, and I'm going to tell you the same thing that I've told the Union from the beginning. I will first start with my injury. I've been diagnosed with cervical radiculopathy, which I believe was caused by the excessive workload of my job. The job that I hold as a Working Superintendent is located at 160 West 73rd. St. It is a fourteen story building consisting of 148 apartments with myself the Superintendent and one Porter Efrain Morales, which has been working with me for the last 19 years. He works five days a week, Saturday, Sunday, Monday, Tuesday, and Wednesdays. He's off Thursdays and Fridays. I'm left alone in the building on those days to do porter and Handyman work. Also every Holiday I did the Porter job for 4 hrs. because there was no one else here to do the job. I would also like you to know that this building was built in 1928, and it doesn't have a trash shoot or trash compactor like most of the modern buildings. We have to take 55 gallon bags and go door to door to collect garbage, recycling and all. This has been my responsibility since I took over as the Superintendent. I didn't have a Porter or Handyman to help me on Thursday or Fridays, even in the winter when it snowed I was left alone to shovel 60 ft. of snow by myself. If it snowed all day, I had to shovel all day. I've never had a snow blower, and if I did it would have probably worn out by now.
                I would also like to mention to you that I do all repairs in the entire building unless it's a major job, and have been doing so for over the last twenty years. A few examples of my repairs are; radiator valves, windows, clogged drains, toilets, and all small electrical problems. On Saturdays and Sundays, my days off, whatever occurs, some emergencies, some not. I'm responsible to handle because there's no one else in the building that can do the job. When I first started working in the building in the early 80's. I remember the Tenant's Committee tried to get management to reinstate the Handyman position back in the building, because the workload is so excessive. When I started working here I was the Porter at 20 years old. I was paid Porter wages, and did Porter and Handyman jobs. I've never had any help with heavy duty jobs all these years.

1

I quote what the Respondent say's in my determination letter. "The Respondent denies that the union contract called for a handyman, however they stated it did require that the Complainant have a porter, which they provided". After all these years where has the porter or handyman been when I needed him, specifically on Thursdays and Fridays and birthdays or any other personal days that my porters takes off, when his job responsibilities fall on my shoulders.

When it comes to my injury, my doctor has determined that it was created over time due to excessive workload over twenty years time. It's a degenerative condition that will only get worse over time. I feel it's a shame that I have to go through all of this to seek justice in this matter. This all began because of my injury seeking help. After all these years of excessive workload anyone would be injured. The reason I'm asking you for help is because I've held this job for over twenty years with no complaints from management, and with a perfect record.

The only reason I'm asking the Supreme Court for an appeal is because my union has refused to help me. I think one day my injury will leave me disabled. To lose this job that I've held for over twenty years I would have no way to pay my doctor's bills.

I would also like to mention something about my determination. I did not give up my grievance freely; my livelihood was on the line. The union told me the only way to get my job back was to give up my grievance. Yes I do know that management fired me to make me give up my grievance and the union helped. The union did not challenge management about my termination, nor did they insist my case go to arbitration. You'll notice in the documents enclosed that from the beginning the union denied me the opportunity to go to arbitration. It will be obvious with my letters that I did not give up grievance freely. If management didn't fire me because of my grievance, why did they fire me after twenty five years with a perfect record? My tenant's are behind 100%. They are also wondering why there letters were not used as character references in my defense in which they were intended. All or the letters were given to the union the day before arbitration and the union has them on file.

I know I'm cutting the time limit close and I'm sorry to send you so much paperwork but this is the only way to prove that the building is missing a man, I'm being underpaid, and that I do have an excessive workload.

2

If these things I've told you don't classify me as a Working Superintendent what does?  After all these years of underpayment, why didn't the union fight for compensation, since I am a Working Superintendent  Please review my documents and advise me what can be done to correct this wrong.

P.S. If you would like to contact me: (917)751-5919

Sincerely,
Welton Goodwin Jr.

*[signature: Welton Goodwin Jr.]*

3

# DOWNTOWN PHYSICAL MEDICINE & REHABILITATION

**19 BEEKMAN STREET • NEW YORK, NEW YORK 10038**
**(212) 513-7711•(212) 513-7723 FAX**

---

Re: Goodwin, Jr., Welton                                                                 10/17/07
Page Four

## MEDICAL RECORDS REVIEWED:

1. An Independent Medical Evaluation by Dr. Drew Stein (orthopedist) dated 08/02/07. The report does state that an MRI of the cervical spine obtained on 05/03/04 revealed cervical spondylosis at C5-C6, asymmetric disc osteophyte complex greater on the right touching the right-sided cord surface. There was right greater than left foraminal narrowing at C3-C4 due to ridging and disc bulging and mild ventral cord impingement and bilateral neuroforaminal narrowing. At the C7-T1 level on the left neuroforaminal narrowing was noted. There was also noted to be report of electro-diagnostic studies dated 06/13/05, which revealed right-sided C7 radiculopathy however the study was limited. There is report of a second MRI of the cervical spine dated 09/13/05, which revealed mild-to-moderate developmental central canal stenosis with superimposed lower cervical spondylosis with no evidence of nerve root impingement. Neuroforaminal stenosis was on the right at C3-C4 and C5-C6.
2. Report of somatosensory awoke potentials of the upper extremities dated 05/08/06 with an impression of "right central conduction deficit, left-sided peripheral conduction deficit.
3. Report of somatosensory awoke potentials of the lower extremities dated 05/08/06 with an impression of "normal study".
4. Report of EMG/nerve conduction studies of the upper extremities dated 05/17/04 with an impression of "borderline sensory and motor latencies in all nerves tested, borderline distal motor latencies right median nerve. It should be noted that the patient is very tall so these numbers are probably normal for him. Other distal sensory and motor latencies are normal as well as the nerve conduction velocities and the F-wave. The conclusion was borderline study, however most likely normal".
5. Report of EMG of the cervical spine and related upper extremities dated 05/17/04 with an impression of "acute and chronic bilateral C4-C5, C5-C6, and left C7 radiculopathy.
6. Report of plain films of the cervical spine dated 03/29/04 reveals "degenerative changes of the mid and lower cervical spine with mild neuroforaminal narrowing at C5 and C6 on the right.
7. A report by Dr. Daveed Frazer dated 04/22/04. Follow-up notes by Dr. Frazer were also reviewed.
8. A report by Dr. Ramon Valderrama (neurologist) dated 05/17/04.

# DOWNTOWN PHYSICAL MEDICINE & REHABILITATION

**19 BEEKMAN STREET • NEW YORK, NEW YORK 10038**
**(212) 513-7711•(212) 513-7723 FAX**

---

Re: Goodwin, Jr., Welton                                                                                       10/17/07
Page Six

### WORKING CAPACITY:

Based on the patient's physical examination, as well as the diagnostic studies described above, it is my medical opinion, that the patient is totally disabled from all work. Due to the pathology within both his cervical and lumbosacral spine, the patient has a severe restriction in his ability to sit, stand, and do any type of repetitive type motions with the cervical spine and the lumbosacral spine. Again due to the above pathology the patient's endurance will be significantly decreased. He will be unable to do computer type work due to his inability to maintain any one position. In addition, over time, the patient's pain will increase, resulting in an inability to perform in a competitive working environment. It is obvious he cannot return to his previous manual job. Again due to the above pathology the patient will be unable to do repetitive kneeling, squatting, stair climbing, nor obtaining awkward positions. His lifting capacity is less than 10 pounds occasionally. Carrying capacity is even less than carrying capacity again occasionally. Due to the severity of his pain, the patient would be expected to miss work intermittently throughout the month. I estimate approximately one to two times per week. It would also be necessary for him to lie down during the day intermittently for approximately 20 to 40 minutes. Lastly, the patient is on narcotic medication in an attempt to control his symptoms. The narcotic medication does have the side effect of making the patient drowsy, and decreasing his mentation, again precluding him from performing in a competitive work environment.

### PROGNOSIS:

The patient's onset of symptoms is approximately in 2004. He has been unable to work since 01/2007. His inability to work is expected to last greater than 12 months. In fact, his present subjective complaints, objective findings, and resultant functional limitations are permanent.

Andrew D. Brown, M.D.

Board Certified Physiatrist
CIME
Fellow American Academy of Disability Evaluating Physicians

ADB/SpectraMedi/IN/RH
166407



# WELTON GOODWIN, JR.
## 160 W. 73RD STREET, APT. 1H
## NEW YORK, NEW YORK 10023

May 7, 2004

Via Certified Mail
Mr. Mirsad Gacevic, Business Agent
Local 32BJ/SEIU
101 Ave of Americas
New York, NY 10013-1906

Re:   Grievances

Dear Mr. Gacevic:

My name is Welton Goodwin, Jr. I recently spoke to you about a grievance that I think I may have. I am writing this letter to tell you a little about myself. I am the Superintendent at 160 W. 73rd Street, where I began working in 1981 as a porter, and where later by chance I got this job.

I was hired temporarily to work as the porter for a man by the name of Soto, who was about to go out to have open-heart surgery. I worked in his place for 6 to 7 months. Unfortunately, Mr. Soto died during surgery. That is how my job became permanent, and soon after becoming permanent, I joined the Union and have been a dues paying member ever since. As such, I am requesting that the Union, consistent with the Union's duty of fair representation to me as a Union member, pursue the grievances outlined below on my behalf.

I was a porter for eight years. My boss's name was Raymond Hughes, who was then the Superintendent. He was an old man and both he and his wife were ill. For the entire eight years that I was a porter, **I did not only my job, but his as well.**

Mr. Hughes was subsequently terminated. I took over upon Mr. Hughes' departure. Management first <u>gave me the job</u>, and then <u>the job was taken away.</u> For four months I worked as a Super's Assistant under a man by the name of "Steve" who could not speak English well. I helped him shut the building down and "showed him the ropes" and generally helped him in every way that I could. However, I was given the job permanently after the tenants intervened and let management know that I was being mistreated. For the entire 17 years that I have been the Super of this building, I have been forced to take off when I do overtime. I have been forced to have my porter take off as well in order, I believe, for management to avoid paying overtime. In fact, I was told that **<u>because I have a free apartment, I am not entitled to overtime</u>**. To this day, I still have the same fight with management regarding overtime. Also I noticed on

1

recent pay stubs, that my hours were "split" in a manner where it appeared that I had only worked 36 hours (when in actuality I had worked 40 hours), and the time was "split" I believe to avoid having to pay me overtime. I have noticed that this occurs during holiday periods. I believe that these abuses have been occurring for some time.

Also, I reviewed my Contract recently and noticed that under the job title heading "Working Superintendent" that "Working" was scratched out. I am not sure of what significance that is. However, I was also told that I was being classified as a building manager, rather than as the building superintendent. I believe that the misclassification is not at all insignificant.

I believe that this is in violation of the New York Labor Law and the Federal Fair Labor Standards Act ("FLSA").

Further, my bonus for the entire seventeen years (17) that I have been here has remained unchanged at $200.00 each year. Given the increase in inflation over the years, the bonus's value has decreased significantly over the years. My work ability has not changed, and in fact has improved with time. Please also note that I am required to "pull garbage" and assume responsibilities for other employees on their days off, e.g., my porter's duties. On some occasions, I have even had to work at the switchboard.

During this entire time period, I have also never had a handyman. When I raised the issue with Management, I was told, "That is how the building is." When I was a porter, there was no handyman.

At one point in time, when Management first purchased the building, there was a handyman, but after he tried to join the union he was terminated notwithstanding that the tenants wanted his employment to continue.

Please let me tell you a little about my building. I am also enclosing relevant portions from a publication regarding the Sherman Square Studios FYI.

I have worked in this building since I was twenty years old. I am now forty-four years old. My grievance is that I work in a fourteen (14) story building with 148 apartments, a basement and laundry room, and a boiler that when it breaks down, I am subjected to an enormous number of complaints from the tenants. I do all repairs in the building from the toilets and the light switches, to maintaining the boiler. I am here to supervise and assist with fuel deliveries, and whenever pipes burst in the building, I have to locate the burst pipe. When the plumbers come, I remain with them until their job is complete regardless of the time of day or night.

After 25 years of this abuse, I have reached my limit. I recently learned from the Union office that I will have to work an additional eleven (11) years in order to draw my full pension. After 17 years of working without a handyman on staff, I recently learned that I have suffered an injury that is not minor, and that is still being evaluated by my doctors who have referred me to a specialist. I do not believe that I can work another eleven years under these conditions. I also learned recently that another Super in my neighborhood, also employed by Solil management is making the same money and he only has 48 apartments in his building. I have 148 apartments. I

believe that I have not and am not being treated fairly by management, and at a minimum that I am entitled to more compensation. I do not understand why, after so many years in my position, I am earning <u>the minimum salary amount</u>. I believe that I am entitled to more compensation. Certainly a Super with 100 more apartments than another Super employed by the same management company should be entitled to more compensation than a Super with only a fraction of the apartments that I have in my building. This is clearly unfair.

I have also enclosed FYI a number of letters that have been written on my behalf by many of my tenants. These letters are a testament to my honesty, character and integrity. I am a very caring and loving person and these letters all are a token of the high esteem in which I am held by my tenants.

I am respectfully requesting that the Union in accordance with its obligation and duty of fair representation pursue these issues on my behalf. I request that you check my payroll, pull my records, and I would like copies to be provided to me as well. If this matter is not resolved through the grievance procedure, I am determined to have it arbitrated, and to take any further legal action that may be necessary to force management to provide overtime pay, a handyman, and to ensure that my salary is commensurate to other Supers with comparable building size and years of service, irrespective of race or ethnicity.

If you need any additional information from me, please advise me and I will do my level best to provide you with any and all documents, records and information to assist you in pursuing these matters on my behalf.

I can be reached by telephone at (917) 751-5919, or (212) 877-6700.

Sincerely,

Welton Goodwin, Jr.

Enclosures


C:   File

3

RECEIVED
AUG 8 2003
CONTRACT DEPT.

# Apartment House Agreement 2003

**Agreement** between the undersigned EMPLOYER, hereinafter termed the "Employer" and SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 32BJ, AFL–CIO, hereinafter termed the "Union," for the following premises:

## 160 West 73rd Street

Wherein it is mutually agreed as follows:

### Article I — Recognition and Union Status

1. This agreement shall apply to all classifications of service employees under the jurisdiction of the Union, which is recognized as their exclusive bargaining representative. Article VII of this Agreement shall also apply to employees of cleaning and maintenance contractors who employ employees in any building committed to this Agreement working in any job category covered by this Agreement.

   Work performed pursuant to the terms of this Collective Bargaining Agreement shall not be performed by persons not covered by the bargaining agreement except as provided in Article VII.

2. There shall be a Union Shop, requiring Union membership by every employee as a condition of employment after the thirtieth (30th) day following employment, or the execution date of this Agreement, whichever is later. The Union shall not request the Employer to discharge or otherwise discriminate against any employee except in compliance with law.

   In the event the Union security provision of the agreement is held to be invalid, unenforceable or of no legal effect generally or with respect to any building because of interpretation or a change of federal or state statute, city ordinance or rule or decision of any government administrative body, agency or subdivision, the permissible Union security clause under such statute, decision or regulation shall be enforceable as a substitute for the Union security clause provided for herein.

3. Upon receipt by the Employer of a letter from the Union's Secretary-Treasurer requesting an employee's discharge because he has not met the requirements of this Article, unless the Employer questions the propriety of so doing, he shall be discharged within fifteen (15) days of said notice if prior thereto he does not take proper steps to meet said requirements. If the Employer questions the propriety of the discharge he shall immediately submit the matter to the Arbitrator. If the Arbitrator determines that the employee has not complied with Section 2, he shall be discharged within ten (10) days after written notice of the determination has been given to the Employer.

4. The Union will hold the Employer harmless for any liability arising from any discharge asked by the Union pursuant to the provisions of this Article provided the Employer has done nothing to cause or increase its own liability concerning removal of employees.

5. The Employer shall be responsible for unpaid dues after receipt of notice provided for in this section and exhaustion of contractual remedies. The Employer's obligation shall begin fifteen (15) days after such notice or if the Employer questions the discharge after the final determination of the Arbitrator.

6. Nothing in this Article shall be construed as an admission that the Employer or his employees are engaged in interstate commerce, in an activity affecting interstate commerce, in the production of goods for interstate commerce, or that the provisions of the Labor-Management Relations Act, as amended, cover any building.

7. The Employer shall on execution of this Agreement furnish to the Union a complete list of the names and home addresses of all employees covered by the Agreement, plus their hours of employment and hourly rate of pay. The Employer shall immediately notify the Union in writing of the name and home address of each new employee engaged by the Employer.

   The Employer shall notify the Union in writing, as soon as a cancellation of an account becomes effective where Union members are employed and the Employer shall notify the Union when he acquires a new building service job.

8. For the purpose of determining the employees who should be members of the Union and to insure the terms of this Agreement are being complied with, the Union shall have the right to inspect the Employer's Social Security reports and all payroll and tax records, and any other record of employment and the Employer shall make such records available to the Union upon request thereof. The Union shall have the right to expedited arbitration in the event the Employer fails to comply with this right of inspection. The Health, Pension, Training, Legal and Supplemental Retirement and Savings (SRSP) Funds shall have the same right to inspect as the Union.

9. The Union does hereby authorize the Employer and the Employer does hereby agree to deduct monthly dues, initiation fees, COPE checkoff, any assessments, fines or other fees due to the Union from each employee covered by this Agreement, from the wages due to each and every member during the term of this Agreement. The Employer agrees that such deductions shall constitute Trust Funds and will be forwarded by the Employer to the Union not later than the twentieth (20th) day of each and every current month. It is understood and agreed that the Employer will make such deductions and authorizations will be signed by the employees affected, all in accordance with the pertinent provisions of existing law. The Union will furnish to the Employer the necessary authorization forms.

   If the Employer fails to remit to the Union the dues deducted in accordance with this section by the twentieth day, the Employer shall pay interest on such dues at the rate of one percent per month beginning on the twenty-first day, unless the Employer can demonstrate the delay was for good cause due to circumstances beyond its control.

   If a signatory does not revoke his authorization at the end of a year following date of authorization, or at the end of the current contract, whichever is earlier, it shall be deemed a renewal of authorization, irrevocable for another year, or until the expiration of the next succeeding contract, whichever is earlier.

## ARTICLE II—Wages, Hours and Working Conditions; Effective Date

1. The wages, hours, terms and conditions of employment set forth in Article IX of this Agreement are hereby made part hereof.

2. This Agreement shall be effective as of April 21, 2003, except as otherwise provided herein.

3. There shall be no lowering of any standards of working conditions of any employee in the employ of the Employer as a result of this Agreement. All employees enjoying higher wages, higher benefits or better working conditions than provided for herein either pursuant to a prior collective bargaining agreement or otherwise, shall continue to enjoy at least the same.

A change of schedules or duties, so long as required relief and luncheon periods are reasonably spaced, shall not violate this Section provided the employee and the Union shall be given at least one week's advance notice and such change is reasonable. The notice for shift changes i.e., change in work hours or days off, shall be three (3) weeks. However, where as of April 21, 2003, an employee regularly received consecutive days off, the practice shall continue, and if any such employee leaves his position for any reason, his replacement shall also receive consecutive days off.

4. There is presently an Agreement between the Union and the Realty Advisory Board on Labor Relations, Inc. (hereinafter "RAB") containing provisions for negotiating for the rescheduling of employees' quitting time for the safety of night workers. It is understood and agreed that any awards, decisions or agreements concluded between the Union and the RAB shall become binding upon the parties hereto upon the same terms and effective dates.

## ARTICLE III—Management Rights

1. The Union recognizes management's right to direct and control its policies subject to the obligations of this Agreement.

2. Employees will cooperate with management within the obligations of this Agreement to facilitate efficient building operations.

3. Employees shall not be discharged by the Employer except for justifiable cause. If any employee is unjustly discharged, he shall be reinstated to his former position without loss of seniority or rank and without salary reduction. The Arbitrator may determine whether, and to what extent, the employee shall be compensated by the Employer for time lost.

4. Any employee who is discharged shall be furnished a written statement of reason(s) for such discharge no later than five (5) days after the date of discharge.

## ARTICLE IV—No Strikes or Lockouts

1. There shall be no work stoppage, strike, lockout or picketing, except as provided in Section 2 and 3 of this Article. If this provision is violated, the matter may be submitted immediately to the Arbitrator.

2. If a judgment or Arbitrator's award against any Employer is not complied with within ten (10) days after such award is sent by registered or certified mail to the Employer, at his last known address, the Union may order a stoppage of work, strike or picketing in the building involved, to enforce the award or judgment, and it may also compel payment of lost wages to any employee engaged in such activity. Upon compliance with the award and/or judgment and payment of lost wages, such activity shall cease.

3. The Union may order a work stoppage, strike or picketing in a building where work previously performed by members of the Union or within its jurisdiction is being performed by persons outside of the bargaining unit anywhere in the building, provided that seventy-two (72) hours written or telegraphic notice is given to the Employer of the Union's intention to do so.

4. The Union shall not be held liable for any violation of this Article where it appears that it has taken all reasonable steps to avoid and end any such violation.

5. No employee covered by this Agreement shall be required by the Employer to pass lawful picket lines established by any local of Service Employees International Union in an authorized strike.

## ARTICLE V—Arbitration

A grievance shall first be taken up directly between the Employer and the Union. Grievances shall be resolved, if possible, within 72 hours after they are initiated, and if not so resolved, shall be promptly submitted to the Office of the Contract Arbitrator. Counsel of the Union and the Employer may be present at any Grievance Procedure meeting.

Any dispute or grievance between the Employer and the Union which cannot be settled directly by them shall be submitted to the Office of the Contract Arbitrator, including issues initiated by the Trustees pursuant to General Clause 40. The Office of the Contract Arbitrator shall initially schedule a hearing within two (2) to fifteen (15) days after either party has served written notice upon the Office of the Contract Arbitrator with copy to the other party of any issue to be submitted. The oath-taking, and the period, and the requirements for service of notice in the form prescribed by statute are hereby waived.

Any grievance, except as otherwise provided herein and except a grievance involving basic wage violations including Pension, Health, Training, Legal and SRSP Fund contributions as set forth in General Clause 40, shall be presented to the Employer in writing within one hundred and twenty (120) days of its occurrence, except for grievances involving suspension without pay or discharge which shall be presented within forty-five (45) days, unless the Employer agrees to an extension. The Arbitrator shall have the authority to extend the above time limitations for good cause shown.

A written award shall be made by the Arbitrator within ten (10) days after the hearing closes. If any award is not timely rendered, either the Union or the Employer may demand in writing of him that the award must be made within ten (10) days. If no decision is rendered within that time, either the Union or the Employer may notify the Arbitrator of the termination of his office as to all issues submitted to him in that proceeding. By mutual consent of the Union and the Employer the time of both the hearing and decision may be extended in a particular case. If a party, after due written notice, defaults in appearing before the Arbitrator, an award may be rendered upon the testimony of the other party.

Due written notice means mailing, telegraphing, or hand delivery to the address specified in this Agreement or in an assumption.

No more than one adjournment shall be granted by the Arbitrator without consent of the opposing party.

All Union claims are brought by the Union alone and no individual shall have the right to compromise or settle any claim without the written permission of the Union.

Arbitration expenses shall be borne equally by the parties unless otherwise specified herein.

In the event that the Union appears at an arbitration without the grievant, the Arbitrator shall conduct the hearing provided it is not adjourned. The Arbitrator shall decide the case based upon the evidence adduced at the hearing.

The procedure herein with respect to matters over which a Contract Arbitrator has jurisdiction shall be the sole and exclusive method for the determination of all such issues, and the Arbitrator shall have the power to award appropriate remedies, the award being final and binding upon the parties and the employee(s) or Employer(s) involved. Nothing herein shall be construed to forbid either party from resorting to court for relief from or to enforce rights under, any award.

There are presently agreements between the Union and the RAB, designating the Office of the Contract Arbitrator — Building Service Industry, as contract arbitrator for all disputes. It is agreed by the parties hereto that the arbitrators serving in such office shall also serve as contract arbitrators under this Agreement. The arbitrators currently are: Howard Edelman, Theodore Lang, Marilyn Levine, Robert Herzog, John Anner, Bernard Young, Nicholas Cooney, Stuart Bauchner, Noel Berman, John Dorsey, Randi Lowitt, and Earl Pfeffer. Any additional arbitrators designated to serve in the Office of the Contract Arbitrator by the Union and the RAB shall be deemed added to the list of Contract Arbitrators for this Agreement.

In the event that one or more of the contract arbitrators is terminated at the request of the Union, pursuant to the agreement between the Union and the RAB, such arbitrator(s) shall be automatically deleted as contract arbitrator under this Agreement.

In the event that one or more of the contract arbitrators is terminated from the Contract Arbitrator's office at the request of the RAB, the Employer may, upon thirty (30) days written notice to the Union, terminate the services of any such Arbitrator(s).

Should either party fail to abide by an arbitration award within two weeks after such award is sent by registered or certified mail to the parties, either party may, in its sole and absolute discretion, take any action necessary to secure such award including but not limited to suits at law. Should either party bring such suit it shall be entitled, if it succeeds, to receive from the other party all expenses for counsel fees and court costs.

In any proceeding to confirm an award, service may be made by registered or certified mail within or without the State of New York as the case may be.

Grievants attending grievances and arbitrations shall be paid their regularly scheduled hours during such attendance.

If a grievant requires an employee of the building to be a witness at the hearing and the Employer adjourns the hearing, the employee witness shall be paid by the Employer for his regularly scheduled hours during attendance at such hearing. This provision shall be limited to one employee witness.

## ARTICLE VI—Sale or Transfer of Building

1. (a) In case of any sale, lease, transfer or assignment of control, occupancy or operation of the premises (hereinafter referred to as "transfer") the Employer shall give the Union two (2) weeks' written notice prior to the effective date thereof; the Employer, be he seller, lessor, transferor, assignor or otherwise, shall, as a condition of the transfer require the transferee to agree in writing to adopt this Agreement and offer employment to all employees of the Employer. Without in any way limiting the other rights and remedies of the Union, anyone failing to adhere to the foregoing provisions shall pay, in addition to such further damages as may be found by the Arbitrator, six (6) months pay for the benefit of the employees as liquidated damages to them.

   (b) In the event of a transfer of the building at any time during which a subcontract exists for work covered by this Agreement, the transferor shall require the transferee, as a condition of the transfer, to adopt the provisions of this Agreement with respect to the subcontracted work and become bound by the provisions of Articles I and VII of this Agreement. In the event that any transferee during the period of subcontracting shall fail to become a party to this agreement as aforesaid, the Union, in addition to the other remedies provided herein, upon three (3) days oral or written notice to the Employer, may cancel Article IV of this Agreement, and then engage in any work stoppage, strike or picketing, without thereby causing a termination of any other provisions of this Agreement, until an agreement is concluded.

   (c) Upon the expiration date of this Agreement as set forth in Article VIII, Section I, this Agreement shall thereafter continue in full force and effect for an extended period until a successor agreement shall have been executed. During the extended period, all terms and conditions hereof shall be in effect including subject to the provisions of this paragraph, the provisions of this Article VI, Section I (a), (b), and (c). During the extended period, the Employer shall negotiate for a successor agreement retroactive to the expiration date, and all benefits and improvements in such successor agreement shall be so retroactive, if such agreement shall so provide. In the event the parties are unable to agree upon terms of a successor agreement, the Union, upon three (3) days oral or written notice to the Employer, may cancel Article IV of this Agreement, and then engage in any work stoppage, strike or picketing, without thereby causing a termination of any other provisions of this Agreement, until the successor agreement is concluded.

   In the event of a transfer during the extended period, the Employer shall comply with Article VI, Section I (a), (b), and (c) of this Agreement and subject to provisions of this Article negotiations shall continue with the transferee Employer; in the event the transferee shall not agree to make benefits or improvements retroactive to the expiration date hereof as set forth in Article VIII, Section I, then, whether or not adjustments have been made therefor at the closing, the Employer shall pay the value or amount of all improvements in benefits, wages and working conditions from the expiration date to the date of closing, in the amount agreed to by such transferee Employer.

2. Nothing herein contained shall be deemed to limit or diminish in any way the Union's right to enforce this agreement against any transferee pursuant to applicable law concerning rules of successorship or otherwise; nor limit or diminish in any way the Union's or any employee's right to institute proceedings pursuant to the provisions of State or Federal labor relations laws, or any statutes, rules or regulations which may be applicable.

3. Any transferee who has failed to adopt this Agreement pursuant to the provisions of Section I of this Article VI by reason of such transferee's lack of knowledge of the requirements thereof may within twenty (20) days after the date of transfer adopt this Agreement provided that, prior to the date of such adoption, there has been no layoff or reduction in force, and that such adoption is retroactive to the date of transfer of title or control.

4. Where a building is acquired by a public authority of any nature through condemnation, purchase or otherwise, the last owner shall guarantee the payment of termination pay and of accrued vacations due to the employees up to the date of transfer of title. The Union will, however, seek to have such authority assume the obligations for payments. If unsuccessful and the last owner becomes liable for such payment, the amounts thereof shall be liens upon any condemnation award or on any amount received by such last owner.

5. This agreement shall be binding and inure to the benefit of all successors, transferees or assignees of the parties.

## ARTICLE VII—Subcontracting

1. The Employer shall not make any agreement or arrangement for the performance of work and/or for the categories of work heretofore performed by employees covered by this Agreement except within the provisions and limitations set forth below.

2. The Employer or contractor shall give advance written notice to the Union at least three (3) weeks prior to the effective date of its contracting for services, or changing contractors, indicating name and address of the contractor. The contractor, within three (3) business days of notice of its cancellation, shall so notify the Union in writing.

3. The Employer shall require the contractor to retain all bargaining unit employees working at the location at the time the contract was awarded and to maintain the existing wage and benefit structure. The Union may reject said contractor where the contractor has not made proper payments to the Health, Pension, Training, Legal and/or SRSP Funds or has habitually failed to comply with labor agreements with the Service Employees International Union (SEIU) covering other buildings in New York City and Nassau and Suffolk Counties and New Jersey in the industry.

The Employer agrees that employees then engaged in the work which is contracted out shall become employees of the initial contractor or any successor contractor, and agrees to employ or re-employ the employees working for the contractor when the contract is terminated or cancelled. This provision shall not be construed to prevent termination of any employee's employment under other provisions of this Agreement relating to illness, retirement, resignation, discharge for cause, or layoff by reason of reduction of force; however, a contractor may not reduce force or change the work schedule without first obtaining written consent from the Union.

With respect to all jobs contracted for by the Employer where members of the Union were employed when the contract was acquired, it is agreed that the Employer shall retain at least the same number of employees, the same employees, under the same work schedule, and assignments including starting and quitting times of each employee.

The Employer shall be liable severally, and jointly with the contractor, for any and all damages sustained by the employees including any unpaid Health, Pension, Training, Legal, and SRSP Fund contributions.

4. This Article and Article VI are intended to be work preservation provisions for the employees employed in a particular building and to categories of employees to the extent that such categories of employees are "fairly claimable" by the Union within existing National Labor Relations Board case law. In the event that the application of this Article or Article VI, or any part thereof, is held to be in violation of law, then this Article or Article VI, or any part thereof, shall remain applicable to the extent permitted by law.

## ARTICLE VIII—Terms of Agreement and Reopenings

1. This agreement shall expire April 20, 2006.

2. There is presently an agreement between the Union and the RAB in the 2003 RAB Apartment Building Agreement which provides that the parties thereto may be required to negotiate additional contributions to the Health, Pension, Training and Legal Funds. The parties hereto agree that any awards, decisions or agreements between the Union and the RAB concerning such increased contributions to the Funds shall be applicable to and binding upon the parties hereto and that the Employer shall pay to the Funds provided under Article X, paragraph 40 of this Agreement, the same payment increases as may be required of Employers generally as a result thereof, and upon the same effective dates required thereunder.

## ARTICLE IX—Building Classifications; Wages and Hours

**A. Building Classifications**

1. (a) Class A buildings are buildings where the assessed value of the land and building, based upon the 1935 assessment, divided by the number of rooms in the building, gives an assessed value of over $4000 a room;

   (b) Class B buildings are buildings where the assessed value of the land and building, based upon the 1935 assessment, divided by the number of rooms in the building, gives an assessed value of over $2,000 a room, and not over $4,000 a room;

   (c) Class C buildings are buildings where the assessed value of the land and building, based upon the 1935 assessment, divided by the number of rooms in the building, gives an assessed value of $2,000 or less a room;

   (d) All non-publicly financed buildings now or in the future, owned cooperatively or in condominium shall be classified Class A and wages shall be increased accordingly.

2. In classifying buildings completed and opened for occupancy after levying of the 1935 assessment, the first year of assessment shall control. Where a building is newly erected or remodeled and open for occupancy after April 21, 1976, and where its proper classification as finally determined indicates that the employees had been paid wages lower than required under said classification, employees shall be paid retroactively all amounts they would have received under proper classification.

3. In calculating the number of rooms, a room shall be considered to be a rentable room enclosed by four walls, with a door and also a window facing a street, court, areaway or airshaft.

4. Bathrooms shall not be counted as rooms except in apartments of three rooms or less, where the bathrooms shall be counted as half-rooms, but this provision shall not cause a revision of existing classifications.

5. Rooms occupied by the superintendent and servants, if above cellar or basement level, shall be included in the total number of rooms.

6. Where stores are on the ground floor, the number of rooms on that floor shall be considered to be the same number, less three, as on a typical floor.

7. When eighty percent (80%) of a building's area and total number of units are changed to commercial and/or professional occupancy, it shall be considered a commercial building no longer covered under this Agreement, but shall be covered under the applicable Commercial Building Agreement.

8. No building service employee may be employed in any building, except within a tenant's apartment, save by the Employer, without the Union's consent.

**B. Wages and Hours**

1. (a) Effective April 21, 2003, each employee covered hereunder shall receive a weekly wage increase of $18.00 (45 cents for each regular straight-time hour worked).

Additionally the minimum weekly rate differentials for handypersons including all employees doing similar or comparable work by whatever title known, shall be increased by two dollars ($2.00) per week and each such employee shall receive a wage increase in an amount necessary to bring them up to the new contract minima.

Minimum wages for a standard workweek shall then be:

|  | Class "A" | Class "B" | Class "C" |
|---|---|---|---|
| Handyperson | $747.63 | $745.32 | $743.01 |
| Others | $678.63 | $676.32 | $674.01 |

(b) Effective April 21, 2004, each employee covered by this agreement shall receive a weekly wage increase of $19.00 (47$^1/_2$ cents for each regular straight-time hour worked).

Additionally the minimum weekly rate differentials for handypersons including all employees doing similar or comparable work by whatever title known, shall be increased by two dollars ($2.00) per week and each such employee shall receive a wage increase in an amount necessary to bring them up to the new contract minima.

Minimum wages for a standard workweek shall then be:

|  | Class "A" | Class "B" | Class "C" |
|---|---|---|---|
| Handyperson | $768.63 | $766.32 | $764.01 |
| Others | $697.63 | $695.32 | $693.01 |

(c) Effective April 21, 2005, each employee covered by this agreement shall receive a weekly wage increase of $20.00 (50 cents for each regular straight-time hour worked).

Additionally the minimum weekly rate differentials for handypersons including all employees doing similar or comparable work by whatever title known, shall be increased by two dollars ($2.00) per week and each such employee shall receive a wage increase in an amount necessary to bring them up to the new contract minima.

Minimum wages for a standard workweek shall then be:

|  | Class "A" | Class "B" | Class "C" |
|---|---|---|---|
| Handyperson | $790.63 | $788.32 | $786.01 |
| Others | $717.63 | $715.32 | $713.01 |

(d) The Union and the RAB presently have an agreement in the 2003 Apartment Building Contract which provides that:

(1) Effective April 21, 2004, in the event that the percentage increase in the cost of living (Consumer Price Index for the City of New York–Metropolitan Area (New York–New Jersey) Urban Wage Earners and Clerical Workers) from February, 2003, to February, 2004, exceeds 6-1/2%, then, in that event, an increase of $.10 per hour for each full 1% increase in the cost of living in excess of 6-1/2% shall be granted effective for the first full workweek commencing after April 21, 2004. In no event shall said increase pursuant to this provision exceed $.20 per hour. In computing increases in the cost of living above 6-1/2%, less than .5% shall be ignored and increases of .5% or more shall be considered a full point. Any increases hereunder shall be added to the minima.

(2) Effective April 21, 2005, in the event that the percentage increase in the cost of living (Consumer Price Index for the City of New York–Metropolitan Area (New York–New Jersey) Urban Wage Earners and Clerical Workers) from February, 2004, to February, 2005, exceeds 6%, then, in that event, an increase of $.10 per hour for each full 1% increase in the cost of living in excess of 6% shall be granted effective for the first full workweek commencing after April 21, 2005. In no event shall said increase pursuant to this provision exceed $.20 per hour. In computing increases in the cost of living above 6%, less than .5% shall be ignored and increases of .5% or more shall be considered a full point. Any increases hereunder shall be added to the minima.

The parties hereto agree that any such increases referred to above which may result shall be fully binding upon the parties hereto in the same amounts and upon the same effective dates as between the Union and the RAB.

2. (a) The standard workweek shall consist of five (5) days of eight (8) hours each but the two days off in such standard workweek need not be consecutive, except as provided in Article II, Section 3, hereof.

Overtime at the rate of time and one-half the regular straight-time hourly rate shall be paid for all hours worked in excess of eight (8) hours per day or of forty (40) hours per week, whichever is greater. There shall be no split shifts. A paid holiday shall be considered as a day worked for the purpose of computing overtime pay. The straight-time hourly rate shall be computed by dividing the weekly wage by the number of hours in the standard workweek.

(b) Luncheon recess shall not be less than forty-five (45) minutes or more than one (1) hour and no employee shall be required to take time off in any work day in excess of one hour for lunch recess without having such time charged against the Employer as working time.

(c) Every employee shall be entitled to two (2) days off in each workweek. Any work performed on such days shall be considered overtime and paid for at time and one-half.

(d) No regular full-time employee shall have his regular working hours as set forth above reduced below the standard workweek in order to effect a corresponding reduction in pay. No replacement employee may be hired for less hours than the employee he is replacing.

3. Except for required relief periods and luncheon recess, hours of work in each day shall be continuous and no employee shall be required to take a relief period or time off in any day in excess of the required relief periods and said luncheon recess, without having said excess relief period or time off charged as working time.

4. Any employee called in to work by the Employer for any time not consecutive with his regular schedule shall be paid for at least four (4) hours of overtime.

5. Any employee who spends one full week or more performing work in a higher paying category shall receive the higher rate of pay for such service.

6. Employees required to work overtime shall be paid at least one hour at the overtime rate, except for employees working overtime due to absenteeism or lateness.

7. Any employee who has worked eight (8) hours in one day and is required to work at least four (4) hours of overtime in that day, shall be given a $15.00 meal allowance.

8. No overtime shall be given for disciplinary purposes. An Employer shall not require an employee to work an excessive amount of overtime.

9. The Employer agrees to use its best efforts to provide a minimum of sixteen (16) hours off between shifts for employees.

## ARTICLE X—General Clauses

1. DIFFERENTIALS—Existing wage differentials among classes of workers within a building shall be maintained. It is recognized that differentials other than those herein required may arise or exist because of wages above the minimum required by this Agreement. No change in such differentials shall be considered a violation of this Agreement unless it appears that it results from an attempt to break down the wage structure for the building. Where an obvious inequity exists because of an employee's regular application of specialized abilities in his work, the amount or correctness of the differential may be determined by arbitration.

Notwithstanding the above, it is understood that licensed engineers covered under this Agreement shall receive the same wages and benefits as paid to engineers under the Realty Advisory Board Agreement covering licensed engineers in New York City except the pension, health, legal and training fund contributions shall continue to be paid under the terms of this Agreement.

2. PYRAMIDING—There shall be no pyramiding of overtime pay, sick pay, holiday pay or any other premium pay. If more than one of the aforesaid are applicable, compensation shall be computed on the basis of the greatest amount.

3. HOLIDAYS—The following are the recognized contract holidays:

| Holiday | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| New Years Day | | Thursday January 1 | Tuesday January 1 | Wednesday January 1 |
| Martin Luther King Day | | Monday January 19 | Monday January 17 | Monday January 16 |
| President's Day | | Monday February 16 | Monday February 21 | Monday February 20 |
| Memorial Day | Monday May 26 | Monday May 31 | Monday May 30 | |
| Independence Day | Friday July 4 | Sunday July 4 | Monday July 4 | |
| Labor Day | Monday September 1 | Monday September 6 | Monday September 5 | |
| Columbus Day | Monday October 13 | Monday October 11 | Monday October 10 | |
| Election Day | Tuesday November 4 | Tuesday November 2 | Tuesday November 8 | |
| Thanksgiving Day | Thursday November 27 | Thursday November 25 | Thursday November 24 | |
| Christmas Day | Thursday December 25 | Saturday December 25 | Sunday December 25 | |

Elective Holiday: Select one of the following or a personal day at the option of the employee.

| | | | | |
|---|---|---|---|---|
| Lincoln's Birthday | | Thursday February 12 | Saturday February 12 | Sunday February 12 |
| Good Friday | | Friday April 9 | Friday March 25 | Friday April 14 |
| Yom Kippur | Monday October 6 | Thursday September 25 | Monday September 13 | |
| Eid al-Fitr | Wednesday November 26 | Sunday November 14 | Thursday November 3 | |

In the event the employee selects a personal day in accordance with the above schedule it shall be granted according to the following provision:

Employees entitled to a personal day may select such day off on five (5) days notice to the Employer provided such selection does not result in a reduction of employees in the building below 75% of the normal work staff. Such selection shall be made in accordance with seniority.

The Employer shall post a holiday schedule on the bulletin board and it shall remain posted throughout the year.

Employees shall receive their straight-time pay for said holidays and in addition thereto all work required to be performed on any of said holidays shall be paid for at time and one-half as such. Any employee required to work on a holiday shall receive at least eight (8) hours pay for such work at the holiday rate of pay (in addition to the eight (8) hours pay he receives for such holiday as such) even though he is not required to work eight (8) hours. All hours worked over eight (8) hours on such a holiday shall be paid for at two and one-half times his regular rate of pay.

Any regular full-time employee ill in any payroll week in which a holiday falls shall receive holiday pay or one day off if he worked at least one day during said payroll week.

Any regular full-time employee whose regular day off, or one of whose regular days off falls on a holiday, shall receive an additional day's pay, or at the option of the Employer, shall receive an extra day off within ten (10) days immediately before or after the holiday. If the employee receives the extra day off before the holiday and his employment is terminated for any reason, he need not compensate the Employer for that day.

4. PERSONAL DAY—All employees shall receive a personal day in each contract year. This personal day is in addition to the holidays listed in paragraph 3 above. The personal day shall be scheduled in accordance with the following provision:

Employees may select such day off on five (5) days notice to the Employer provided such selection does not result in a reduction of employees in the building below 75% of the normal work staff. Such selection shall be made in accordance with seniority.

5. VOTING TIME—Election Day is a recognized holiday and any employee required to work on Election Day, and who gives legal notice, shall be allowed two (2) hours off, such hours to be designated by the Employer, while the polls are open. Said two (2) hours shall be included in the eight (8) hour day for which such employee receives his regular straight-time idle pay, but shall not be considered hours actually worked for the purpose of premium pay.

6. SCHEDULES—Overtime, Sunday and holiday work shall be evenly distributed so far as is compatible with efficient building operation, except where Sunday is a regular part of the workweek.

7. RELIEF EMPLOYEES—Relief or part-time employees shall be paid the same hourly rate as full-time employees in the same occupational classification.

8. METHOD OF PAYMENT OF WAGES—All wages, including overtime, shall be paid weekly in cash or by check with an itemized statement of payroll deductions. If a regular pay day falls on a holiday, employees shall be paid on the preceding day.

Employees paid by check who work during regular banking hours shall be given reasonable time to cash their checks exclusive of their break and lunch period. The Employer shall make suitable arrangements at a convenient bank for such check cashing.

In the event an Employer's check to an employee for wages is returned due to insufficient funds on a bona fide basis twice within a year's period, the Employer shall be required to pay all employees by cash or certified check.

The Employer may require, at no cost to the employee, than an employee's check be electronically deposited at the employee's designated bank. The Union shall be notified by the Employer of this arrangement.

9. LEAVE OF ABSENCE AND PREGNANCY LEAVE—(a) Once during the term of this Agreement, upon written application to the Employer and the Union, a regular employee who has been employed in the building for five (5) years or more shall be granted a leave of absence for illness or injury not to exceed six (6) months.